UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CARL BROWN,

                                    Plaintiff,

               v.

PAUL CHAPPIUS, JR., CRAIG DIEGO,
STEPHEN WENDERLICH, PAUL YOUMANS,
JAMEY MORRIS, JEREMY TAYLOR,
DANIEL STAIGHT, and KIRBY BUNNELL,

                                    Defendants.
_____

                                    REPORT
                                      and
                                RECOMMENDATION

                                13-CV-00105V(F)

APPEARANCES:          CARL BROWN, *Pro Se*
                      01-A-0717
                      Clinton Correctional Facility
                      Box 2001
                      Dannemora, New York  12929

                      ERIC T. SCHNEIDERMAN
                      New York State Attorney General
                      Attorney for Defendants
                      KATHLEEN M. KACZOR
                      Assistant Attorney General, of Counsel
                      350 Main Street
                      Suite 300A
                      Buffalo, New York  14202

## JURISDICTION

        This case was referred to the undersigned by Honorable Richard J. Arcara on

October 1, 2014, for all pretrial matters.[1]  The matter is presently before the

undersigned on Defendants' motion for summary judgment filed February 27, 2015 (Dkt.

96), and Plaintiff's motion for injunctive relief filed January 14, 2016 (Dkt. No. 117).

_____

[1] By text order entered March 8, 2016 (Dkt. 122), this matter was reassigned to District Judge Lawrence
J. Vilardo.

## BACKGROUND

Plaintiff Carl Brown ("Plaintiff"), proceeding *pro se*, commenced this civil rights action on February 5, 2013, asserting three claims for relief against Defendants, all employees of New York State Department of Corrections and Community Supervision ("DOCCS").  On July 25, 2013, Plaintiff filed an amended complaint (Dkt. 15) ("Amended Complaint").  In particular, Plaintiff claims that while incarcerated at Elmira Correctional Facility, Defendants (1) violated his Eighth Amendment rights by failing to protect Plaintiff from a physical assault, extortion threats, and loss of personal property ("First Claim"); (2) violated his Eighth Amendment rights by issuing inmate porters weapons the porters used to stab Plaintiff ("Second Claim"); and (3) violated his Fourteenth Amendment rights by retaliating against Plaintiff for filing inmate grievances regarding the loss or destruction of Plaintiff's legal work and placing Plaintiff in disciplinary housing ("Third Claim").

On February 27, 2015, Defendants filed a motion for summary judgment (Doc. No. 96) ("Defendants' Motion"), attaching Defendants' Memorandum of Law in Support of Summary Judgment (Dkt. 96-1) ("Defendants' Memorandum"), a Statement of Undisputed Facts (Dkt. 96-2) ("Defendants' Facts Statement"), and the Declarations of Kirby Bunnell (Dkt. 96-3) ("Bunnell Declaration"), Paul R. Chappius, Jr. (Dkt. 96-4) ("Chappius Declaration"), Craig Diego (Dkt. 96-5) ("Diego Declaration"), Assistant Attorney General Kathleen M. Kaczor (Dkt. 96-6) ("Kaczor Declaration"), Jamey Morris (Dkt. 96-7) ("Morris Declaration"), Daniel Staight (Dkt. 96-8) (Staight Declaration"), Jeremy Taylor (Dkt. 96-9) ("Taylor Declaration"), Stephen Wenderlich (Dkt. 96-10) ("Wenderlich Declaration"), and Paul Youmans (Dkt. 96-11) ("Youmans Declaration"),

and an Appendix of Unofficial Authorities (Dkt. 96-12).  On April 27, 2015, Plaintiff filed Plaintiff's Affidavit in Opposition for Summary Judgment (Dkt. 102) ("Plaintiff's Affidavit"), attaching exhibits A through H ("Plaintiff's Exh(s). __"), the Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment Pursuant to FRCP Rule 56 (Dkt. 103) ("Plaintiff's Response"), and a Statement of Undisputed Facts (Dkt. 104) ("Plaintiff's Statement of Facts").  On May 21, 2015, Plaintiff filed an amended Statement of Undisputed Facts (Dkt. 106) ("Plaintiff's Amended Statement of Facts").  On June 8, 2015, Plaintiff filed an additional exhibit to his response in opposition to summary judgment (Dkt. 107) ("Plaintiff's Exh. I").   On July 29, 2015, Defendants filed Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment (Dkt. 108) ("Defendants' Reply"), attaching an Appendix of Reply Unreported Authorities (Dkt. 108-1).  On October 30, 2015, Plaintiff filed a sur-reply in further opposition to summary judgment (Dkt. 111) ("Plaintiff's Sur-Reply").

On January 14, 2016, Plaintiff filed a motion for an injunction (Dkt. 117) ("Injunction Motion"), requesting a court order directing his transfer from Clinton Correctional Facility, where Plaintiff was then incarcerated, to another DOCCS correctional facility.  On March 31, 2016, Defendants filed Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for an Injunction (Dkt. 125) ("Defendants' Response"), attaching an Appendix of Unreported Cases (Dkt. 125-1).  On April 25, 2016, Plaintiff filed his Reply to Opposition and Memorandum of Law (Dkt. 129) ("Plaintiff's Reply").  Oral argument was deemed unnecessary.

3

Based on the following, Defendants' Motion should be GRANTED; Plaintiff's

Motion should be DISMISSED as moot or, alternatively, should be DENIED.


## FACTS[2]

Plaintiff maintains that since being received into the custody of DOCCS on

February 8, 2001, Plaintiff has repeatedly been subjected to extortion demands by other

inmates and various, unidentified corrections officers because Plaintiff's father is Barry

Gordy, Jr., an executive with Motown.  According to Plaintiff, the extortionists demanded

Plaintiff provide money or risk physical harm.  At all times relevant to the instant action,

Plaintiff was incarcerated at Elmira Correctional Facility ("Elmira"), in Elmira, New York.[3]

Specifically, on April 23, 2012, Plaintiff was transferred from NYCCI[4] to Elmira.  Upon

being received at Elmira, Plaintiff was given the opportunity to indicate whether he had

any known enemies or was otherwise prone to being victimized and was also advised of

the procedures for requesting protective custody.  At that time, Plaintiff declined to

identify any known enemies, request protective custody, or provide any reason why

Plaintiff should not be housed in the general prison population, nor did Plaintiff later

avail himself of such procedures to advise of a security or safety concern.

Plaintiff, however, alleges notifying various DOCCS officials of unspecified

threats he had received.  In particular, on April 23, 2012, Plaintiff wrote Defendant

Elmira Superintendent Chappius ("Chappius"), a letter notifying him of a threat to which

_____

[2] Taken from the pleadings and motion papers filed in this action.
[3] Since commencing this action, Plaintiff has been transferred from Elmira to Southport Correctional Facility ("Southport"), Sing Sing Correctional Facility ("Sing Sing"), Great Meadow Correctional Facility ("Great Meadow"), and is presently housed at Clinton Correctional Facility ("Clinton"), in Dannemora, New York.

[4] The record does not indicate for what "NYCCI" is the abbreviation.

Chappius failed to take any action.  "Sometime after April 2012," Plaintiff notified Defendant Deputy Superintendent of Security Wenderlich ("Wenderlich"), of "the problem" but Wenderlich did not respond.  Amended Complaint at 9, ¶ 6.  In June 2012, Plaintiff was moved at Elmira to G-Block and allegedly notified Defendant Sgt. Youmans ("Youmans"), "about the threat," to which Youmans responded that he was "too busy." *Id.* ¶ 7.  Two weeks later, Plaintiff notified DOCCS Sgt. Powers ("Powers") about "the problem" but Powers "did nothing."  *Id.* ¶ 9.  "A couple of days later," Plaintiff notified Wenderlich "of the problem and he did nothing."  *Id.* ¶ 10.  Finally, on June 7, 2012, Plaintiff allegedly again notified Wenderlich "and he never answered."  *Id.* ¶ 11.

On June 7, 2012, Plaintiff, was escorted to the showers, but was denied a shower when Defendant C.O. Morris ("Morris"), perceived Plaintiff being disrespectful toward him.  Plaintiff filed a grievance regarding the shower denial, and maintains that Morris told other corrections officers about the grievance causing the corrections officers to threaten extortion and to assist other inmates in a physical assault on Plaintiff on June 8, 2012.  Specifically, at 3:00 P.M. on June 8, 2012, while Plaintiff, then housed in "medical keeplock" and using crutches to ambulate, [5] was in the showers, he was stabbed eight times ("the assault"), by four inmate porters ("inmate porters"), while Defendant corrections officers Bunnell ("Bunnell"), Taylor ("Taylor"), and "John Doe" observed.  Plaintiff maintains that after the assault, he returned to his assigned cell "to fix myself up."  Amended Complaint at 10 ¶ 15.  According to Plaintiff, despite observing the assault, Bunnell went to Plaintiff's cell and refused Plaintiff medical treatment.  Later on June 8, 2012, at 8:30 P.M., Plaintiff reported to C.O. Powers ("Powers") that Plaintiff

---

[5] The record does not reveal why Plaintiff was on crutches on June 8, 2012, nor when Plaintiff was placed in medical keeplock.

was in need of medical assistance because he had been stabbed earlier that day in the showers.  Plaintiff was issued an Inmate Misbehavior Report ("First Misbehavior Report"), for failing to promptly report an injury to the correctional facility's staff, and was transported to Arnot Ogden Medical Center ("Arnot Ogden" or "the medical center") in Elmira for treatment of his stab wounds, where Plaintiff was admitted and remained hospitalized for six days.

While hospitalized for treatment of his wounds, Plaintiff was issued another Inmate Misbehavior Report ("Second Misbehavior Report"), in connection with a disturbance Plaintiff caused at Arnot Ogden.  In particular, Plaintiff, who was guarded by Defendant C.O. Daniel Staight ("Staight"), reached for a telephone intending to call the nurse.  When Staight ordered Plaintiff to put down the telephone and to use the call button for the nurse, Plaintiff became disrespectful and for the next 20 minutes yelled and directed obscene and abusive language toward Staight, threatening to commence a civil action against Staight, report Staight to the police, and physically harm Staight.  Plaintiff's tirade finally ceased when Sgt. Cramner, responding to a call from Staight, arrived at Arnot and asked Plaintiff if he would like to return to Elmira.  The Second Misbehavior Report charged Plaintiff with violating DOCCS Rules 102.10 (threats), 104.11 (conduct involving threat of violence), 104.13 (disturbing the order of a facility), and 107.11 (harassing an employee).  Plaintiff maintains that Staight filed the disciplinary charges against Plaintiff because Plaintiff had stated that the inmate porters who stabbed Plaintiff had obtained the weapons used during the assault from C.O. Morris.

When Plaintiff was discharged from the medical center, he was transferred back to Elmira where he was placed in the Special Housing Unit ("SHU") because of the Second Misbehavior Report. Plaintiff maintains that while in SHU he was denied food, legal mail, exercise, and showers for three weeks, but when he complained of the deprivations to Defendants Chappius, Wenderlich, Diego, and Youmans, they responded by advising Plaintiff there were no deprivation orders against him.

Near the end of Plaintiff's three-week stay in Elmira's SHU, Plaintiff's property was packed by C.O. Miller ("Miller"), who is not sued as a Defendant, in preparation for Plaintiff to be transferred to Southport Correctional Facility ("Southport"). After arriving at Southport, Plaintiff discovered that much of his property was missing, including trial transcripts, his personal television, and his copy of the Quran. Plaintiff filed an inmate grievance regarding the missing property, receiving a response from Miller who advised that the missing property had been sent to Plaintiff's home. Plaintiff maintains that no package containing his property was ever delivered to his home, and that Plaintiff was placed and continuously held in SHU for filing the grievance complaining about his missing property.

## DISCUSSION

### 1.    Motion for Summary Judgment

Defendants argue in support of summary judgment that Plaintiff's own deposition testimony establishes the assault was a "surprise attack by unknown inmates with whom [Plaintiff] had 'no beef,'" and for which Plaintiff never requested any protection and the risk of which Defendants were not aware. Defendants' Memorandum at 1

(bracketed material added).[6]  Plaintiff also failed to avail himself of any of the protective measures of which Plaintiff was aware, despite Plaintiff's asserted knowledge that an unidentified corrections officer had provided the inmate porters with the weapons used to assault Plaintiff.  *Id.* at 1-2.  Insofar as Plaintiff maintains that he was subjected to three-week deprivation order upon being released from Arnot Ogden into Elmira's SHU, Plaintiff has produced no proof of any such deprivation order, and Plaintiff's own documents and testimony establishes Plaintiff previously complained about loss of television, showers, and legal mail for incidental periods of time.  *Id.* at 2.  Nor does Plaintiff have any evidence causally connecting any protected activity with the alleged retaliatory action of Defendants.  *Id.*  Defendants furthermore argue Plaintiff cannot establish the requisite personal involvement of each Defendant in an alleged constitutional violation.  *Id.* at 3.

In opposition to summary judgment, Plaintiff points to no evidence of the asserted constitutional violations but, rather, reiterates his claims against Defendants, Plaintiff's Response, *passim*, which Defendants maintain establishes the strength of their arguments in support of summary judgment.  Defendants' Reply, *passim*.  In further opposition to summary judgment, Plaintiff asserts he never pursued any of the established procedures for complaining about threats of physical violence choosing instead to write to various DOCCS officials about the threats.  Plaintiff's Sur-Reply, *passim*.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex*

---

[6] Unless otherwise indicated, all bracketed material has been added.

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

## 2.     42 U.S.C. § 1983

Plaintiff's claims seek damages for alleged violations of his constitutional rights pursuant to 42 U.S.C. § 1983 ("§ 1983"), which imposes civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States. Section 1983, however, does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Here, Plaintiff claims violations of his Eighth and Fourteenth Amendment rights, as made applicable to the states by the Fourteenth Amendment.

It is basic that a defendant's personal involvement in the alleged constitutional deprivation is a prerequisite to liability in a § 1983 action. *Spavone v. New York State Dept. of Correctional Services*, 719 F.3d 127, 135 (2d Cir. 2013) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). A supervisor's liability in a § 1983 action "cannot rest on respondeat superior." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (citing cases)). To establish liability under § 1983, Plaintiff must establish a Defendant was personally involved in the claimed violation to hold such Defendant liable. *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016). "[M]ere 'linkage in the

prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson*, 347 F.3d at 435 (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985), and citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting a § 1983 defendant may not be held liable for constitutional violations merely because he holds a position of high authority)).  Instead, the requisite personal involvement

> "can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring."

*Id.* (quoting *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003)).

### A.    Official Capacity Claims

Defendants argue that Plaintiff's official capacity claims against Defendants must be dismissed as barred by sovereign immunity or moot.  Defendant's Memorandum at 4-5.  Plaintiff has not responded in opposition to this argument.

It is settled that the naming of a government official in his official capacity is equivalent to suing the government entity for which no § 1983 claim lies absent establishing the challenged conduct was undertaken pursuant to the municipality's official custom or policy.  *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("[W]hen the defendant sued for discrimination under . . . § 1983 is a municipality – or an individual sued in his official capacity – the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." (internal citations omitted)).  In the instant case, Plaintiff has failed to allege, or to argue in

opposition to summary judgment, that any Defendant's actions was pursuant to any official DOCCS's custom or policy.  Accordingly, summary judgment should be GRANTED in favor of Defendants insofar as Plaintiff asserts any claims against any Defendant in his official capacity.

### B.    Eighth Amendment

Plaintiff Eighth Amendment claims include that Defendants failed to protect him from the June 8, 2012 assault by four inmate porters, provided the inmate porters with the weapons used in the assault, and failed to treat Plaintiff's injuries sustained during the assault.  Defendants seek summary judgment on all of Plaintiff's Eighth Amendment claims.

To establish a constitutional violation under the Eighth Amendment, an inmate must meet both an objective and subjective requirement.  *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (citing cases).  The objective requirement is met where the alleged violation is "sufficiently serious" by objective standards.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  The subjective prong requires the inmate allege facts which, if true, would establish a prison official was deliberately indifferent to his health or safety.  *Farmer*, 511 U.S. at 837.

### 1.    Failure to Protect

Plaintiff alleges Defendants Chappius, Diego, Wenderlich, and Youmans failed to protect Plaintiff from the assault by failing to respond to Plaintiff's claims of threats, providing the inmate porters with the weapons used in the assault, and failing to intervene despite observing the assault.  Defendants argue in support of summary judgment that Plaintiff's own deposition testimony establishes Plaintiff was involved in a

surprise attack by unknown inmates with whom Plaintiff had "no beef." Defendants'

Memorandum at 1. Defendants further maintain Plaintiff has failed to provide any proof

that he requested protection from Defendants prior to the attack, that any Defendant

was aware that Plaintiff faced any harm, or that Plaintiff availed himself of any of the

protective measures, of which Plaintiff was aware. *Id.* at 1-2. In opposition to summary

judgment, Plaintiff argues Defendants Chappius and Wenderlich failed to respond to

Plaintiff's letters complaining about threats to his life, Defendant Youmans ignored

Plaintiff's verbal complaints about physical threats to his life upon being moved to G-

Block, Defendant Diego provided the inmate porters with the weapons used to assault

Plaintiff, and Defendants Taylor, Bunnell, and Staight failed to intervene despite

observing the assault. Plaintiff's Response at 2-3. In further support of summary

judgment, Defendants maintain Plaintiff has failed to establish a material issue of fact

exists as to either the objective or subjective prong of his Eighth Amendment claims.

Defendants' Reply at 3-6.

The Eighth Amendment "imposes a duty on prison officials 'to take reasonable

measures to guarantee the safety of inmates in their custody.'" *Garcia v. Witkowski*,

988 F.Supp.2d 360, 361 (W.D.N.Y. 2013) (quoting *Hayes v. New York City Dep't of

Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 832-33))). "A failure-

to-protect claim requires a showing that prison officials acted with 'deliberate

indifference' to the inmate's safety." *Id.* (citing *Morales v. New York State Dep't of Corr.*,

842 F.2d 27, 30 (2d Cir. 1988)). A prison official acts with deliberate indifference toward

an inmate's safety only if the official, despite knowledge that the inmate faces a

substantial risk of serious harm, disregards that risk by failing to take reasonable

measures to abate it. *Farmer*, 511 U.S. at 835-37. *See Garcia*, 988 F.Supp.2d at 362 ("in failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific harm to his safety."). Neither mere negligence nor a prison guard's mere failure to act reasonably is enough to state an Eighth Amendment deliberate indifference claim. *Garcia*, 988 F.Supp.2d at 362 (citing *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996)). Instead, the inmate must show "actual or imminent harm." *Benjamin v. Fraser*, 343 F.3d 35, 41 n. 17 (2d Cir. 2003) (quoting *Lewis v. Casey*, 518 U.S. 343, 350 (1996)), *overruled on other grds.*, *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009).

Insofar as Plaintiff claims Chappius and Wenderlich, as the recipient of Plaintiff's written complaints about threats to his life, failed to properly investigate such complaints and thus are responsible for the assault, mere receipt of a letter is insufficient to establish the requisite personal involvement for § 1983 liability; rather, personal involvement may be found were a supervisory official receives and acts on or undertakes an investigation of the inmate's complaint or grievance. *Rivera v. Fischer*, 655 F.Supp.2d 235, 238 (W.D.N.Y. 2009). Nor is the forwarding of a letter to a subordinate for investigation and response sufficient to hold the prison official personally involved in the alleged constitutional deprivation. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997). Significantly, Plaintiff fails to allege any facts establishing that Chappius or Wenderlich became personally involved in the investigation into the matters raised by Plaintiff's letters of complaint. *Rivera*, 655 F.Supp.2d at 238. Furthermore, with one exception, Chappius and Wenderlich deny ever receiving any of the letters Plaintiff maintain he wrote complaining of the threats, and the one letter Wenderlich admits

receiving is insufficient to establish Wenderlich knew or should have known that Plaintiff was being threatened by certain inmates with "actual or imminent harm." *Benjamin*, 343 F.3d at 41 n. 17. Specifically, the one letter Wenderlich admits receiving is dated June 7, 2012, the day before the assault, but bears a stamp indicating it was received in the Elmira Deputy Superintendent's office on June 11, 2012, June 7, 2012 Letter,[7] three days after the assault such that Wenderlich cannot be held responsible for failing to protect Plaintiff based on any statements contained in the June 7, 2012 Letter. Significantly, a plain reading of the June 7, 2012 Letter shows Plaintiff did not report a specific threat by a specific actor but only alerts Wenderlich to a general threat that the corrections officers in G-Block told other inmates that Plaintiff was the son of Barry Gordy, was incarcerated on child molestation charges and will let the inmate porters "do whatever they want to do." *Id.* Such general and conclusory assertions that an inmate fears for his safety, however, are insufficient to put correctional facility officials on notice of a substantial risk of serious harm; rather, "in order to demonstrate such deliberate indifference, the plaintiff must show that 'he [was] incarcerated under conditions posing a substantial risk of serious harm' and that prison officials had 'knowledge that [the] inmate face[d] a substantial risk of serious harm and . . . disregard[ed] that risk by failing to take reasonable measures to abate the harm.'" *Garcia*, 988 F.Supp.2d at 361-62 (quoting *Hayes*, 84 F.3d at 620). Nor does the letter show Plaintiff complained to Defendants about a "specific harm to his safety." *Garcia*, 988 F.Supp.2d at 362. Accordingly, Plaintiff's single, non-specific statement that Elmira officials would permit inmate porters to "do whatever they want to do," even if received by Wenderlich prior to

---

[7] Wenderlich Declaration Exh. A.

the June 8, 2012 assault, was insufficient to alert Wenderlich that Plaintiff faced a substantial risk of serious harm.

Further, Plaintiff's letter of April 23, 2012 letter to Chappius, Plaintiff's Exh. B, advising that Defendants Bunnell and Morris were trying to get Plaintiff killed for filing a grievance regarding the denial of a shower, which Chappius denies ever receiving, Chappius Declaration ¶ 11, even if Chappius did receive the letter, its failure to advise of "actual or imminent harm," *Benjamin*, 343 F.3d at 41 n. 17, renders Chappius's failure to take action in accordance with the asserted threat mere negligence which is insufficient to state an Eighth Amendment deliberate indifference claims.  *Garcia*, 988 F.Supp.2d at 362 (requiring inmate plaintiff establish defendant prison officials had actual knowledge of a specific threat to the plaintiff's safety to support an Eighth Amendment failure to protect claim).

Although Plaintiff maintains that Defendant Morris must have provided the inmate porters with the ice picks because Plaintiff had overheard Morris telling other inmates Morris wanted Plaintiff out of Elmira before Morris retired, *id.*, Morris states that at the time of the assault, Morris was working at Elmira in the school building four days a week and in the Field House Gas Booth one day a week, Morris Declaration ¶¶ 1, 10, where Plaintiff was not responsible for guarding, supervising, or interacting with inmates in the blocks, *id.* ¶ 9, did not work the 3-11 shift during which Plaintiff was assaulted, *id.* ¶ 10, and has never worked in Elmira's G-Block.  *Id.* ¶ 4.  Morris not only denies providing any inmates with weapons, *id.* ¶ 8, but maintains he never would bring any weapon into a correctional facility because doing so would create a dangerous situation for both inmates and corrections officers, *id.*, an assertion Plaintiff does not dispute.  Nor does

Plaintiff point to any evidence tending to contradict Morris's averments sufficient to require trial. Similarly, with regard to Defendant Staight, whom Plaintiff also claims issued the inmate porters the weapons with which Plaintiff was stabbed, Plaintiff's Response at 2, Staight's involvement in this case was limited to guarding Plaintiff while he received medical treatment at Arnot Ogden, Staight Declaration ¶ 4, which is consistent with Plaintiff's description at his deposition of Staight's role in the circumstances of Plaintiff's assault. Plaintiff's Dep. Tr.[8] at 140 (testifying Staight "was an outsider. He came for an outside hospital trip. He came to relieve two officers [at Arnot Ogden]. . . ."). Plaintiff further, in his deposition testimony, described Taylor's involvement as limited to failing to intervene in the assault and, later, escorting Plaintiff from his cell to Elmira's medical unit for treatment of Plaintiff's stab wounds. *Id.* at 139. Accordingly, there are no disputed facts on which a reasonable jury could find any of the Defendants provided the inmate porters with the weapons used in the assault against Plaintiff.

Although Plaintiff also maintains Defendants "Bunnell, Taylor and "other Correctional Officers" observed the inmate porters assault Plaintiff, Plaintiff's Statement of Facts ¶ 7, Plaintiff testified at his deposition that Bunnell and Taylor were playing cards at the officer's desk when Plaintiff walked past en route to the showers. Plaintiff's Dep. Tr. at 76-77. Significantly,

> [t]o establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded

---

[8] References to "Plaintiff's Dep. Tr." are to the page of the transcript of Plaintiff's deposition, the relevant portions of which are filed as Kaczor Declaration A.

that risk by intentionally refusing or failing to take reasonable measures to end
the use of excessive force.

*Evans v. Murphy*, 2014 WL 4437771, at * 9 (W.D.N.Y. Mar. 13, 2014) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)).

Here, Plaintiff does not allege that Bunnell and Taylor were close enough to the shower

as to realistically be able to intervene in the assault which Plaintiff repeatedly describes

as happening "so fast." Plaintiff's Dep. Tr. at 34, 40, 41, 43. Based on these

undisputed facts, no reasonable jury could find that either Bunnell, Taylor, or any other

Defendants had a realistic opportunity to intervene in the assault.

Plaintiff's attribution of the assault to Defendants' failure to lock the showers

despite the fact that Plaintiff was on crutches, Plaintiff's Dep. Tr. at 32, 34, 139, is also

without merit. As Defendant Chappius explains, inmates on medical keeplock, as was

Plaintiff at the time of the assault, "are housed on the flats and showers are not locked."

Chappius Declaration ¶ 31. According to Chappius, locking the shower doors for

inmates on medical keeplock "would present significant security concerns . . . [because]

in the event of an emergency in the shower, locked showers would prevent staff [from]

quickly responding." *Id.* Further, "[l]ocking inmates in the shower area together

threatens inmate safety, would allow for exchange of contraband, and could lead to acts

of violence, including sexual violence." *Id.* Plaintiff does not dispute any of these

assertions. Accordingly, there is no merit to Plaintiff's assertion that Defendants

disregarded a substantial risk of serious harm to Plaintiff by failing to lock the showers

sufficient to require trial. *Farmer*, 511 U.S. at 835-37; *Garcia*, 988 F.Supp.2d at 362

Nor did Plaintiff request, either before or after the assault, to be placed in

protective custody which was available. *See* Chappius Declaration ¶¶ 8-15; Wenderlich

Declaration ¶¶ 8-16.  Among the options available had Plaintiff sought protection against an assault were requesting different housing or protective custody, advising a DOCCS intake counselor, corrections sergeant, or his assigned counselor of any known enemies housed within a particular correctional facility, and advising corrections officials of any reason to avoid housing in the general prison population including, *inter alia*, being victim prone and being in receipt of a specific threat.  *Id.  See Wood v. Skinner*, 2000 WL 1209378, at *2 (W.D.N.Y. Aug. 25, 2000) ("the fact that plaintiff had previously refused to enter 'protective custody' undermines any inference that defendants have been – and continue to be – indifferent to plaintiff's health and safety.  If anything, such refusal is indicative of plaintiff's own indifference to his own health and safety."). Plaintiff's description of the assault as a "surprise," Plaintiff's Dep. Tr. at 43 (Plaintiff admitted he was "surprised by the attack" because Plaintiff "never had a beef" with any inmates), is consistent with Defendants' assertions that they were unaware that Plaintiff faced a substantial threat of serious harm, negating any reasonable inference that Defendants were aware of such threat sufficient to require trial.  Also consistent with Plaintiff's assertion that the attack was a surprise is that Plaintiff was unable to identify the inmate porters by name, Plaintiff's Dep. Tr. at 32, and also unable to describe the perpetrators of the assault other than as "white" inmate porters with whom Plaintiff never had any problem.  *Id.* at 32-33.  Plaintiff also was unaware of what the inmate porters had used as weapons, stating only that the doctor who examined him after the assault thought the stab wounds were caused by ice picks.  *Id.* at 41.

In short, Plaintiff's complete failure to point to any factual dispute regarding Defendants' knowledge that Plaintiff faced a substantial risk of serious harm, and failed

to intervene to avert such risk of harm, requires summary judgment be GRANTED on Plaintiff's Eighth Amendment failure to protect claim.

### 2.     Conditions of Confinement

Plaintiff claims he was denied timely medical treatment for his stab wounds following the assault, Amended Complaint ¶ 16, and that upon being placed in SHU for three weeks following his release from Arnot Ogden, he was deprived showers, legal mail, the ability to exercise, and food. *Id.* at ¶ 22, and at 12. Plaintiff also maintains Defendants destroyed or lost Plaintiff's personal property, including trial transcripts, his personal television, and a copy of the Quran. *Id.* ¶¶ 24-28.

"While the Eighth Amendment's prohibition against cruel and unusual punishment 'does not mandate comfortable prisons,' the conditions must be at least 'humane.'" *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and *Farmer*, 511 U.S. at 832. "Under the Eighth Amendment, States must not deprive prisoners of their 'basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). To prevail on an Eighth Amendment claim based on conditions of confinement, a plaintiff must establish (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *Farmer*, 511 U.S. at 834. A deliberate indifference claim has both objective and subjective elements. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of

decency." *Phelps*, 308 F.3d at 185 (quoting *Helling*, 509 U.S. at 35). "Concerning the 'subjective requirement, the Supreme Court has explained that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . .'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

### a.    Failure to Treat

Plaintiff claims that after he was stabbed in the shower, he returned to his cell where he attempted to "fix [himself] up." Amended Complaint ¶ 15. According to Plaintiff, Defendants Bunnell and Taylor went to Plaintiff's cell and denied Plaintiff medical treatment for the stab wounds despite observing the assault, in violation of the Eighth Amendment. *Id.* ¶ 16. Plaintiff argues in opposition to summary judgment that after returning to his cell following the assault, Defendant Bunnell denied Plaintiff medical attention, despite observing the assault, and Plaintiff waited two hours for medical attention when other inmates, Edwin Maddez ("Maddez") and Troy Harris ("Harris"), summoned Taylor to obtain medical treatment for Plaintiff. Plaintiff's Affidavit ¶¶ 11-13.[9] Defendants argue in support of summary judgment that Plaintiff's deposition testimony establishes that neither Bunnell nor Taylor was indifferent to Plaintiff's injuries. Defendants' Reply at 6. In further opposition to summary judgment, Plaintiff

---

[9] Defendants' Memorandum contains no argument in support of summary judgment on Plaintiff's failure to treat claim, noting that Plaintiff does not allege in his Amended Complaint that he was denied medical treatment and never filed any grievance claiming as much. A plain reading of the Amended Complaint, however, establishes that Plaintiff alleges "C.O. Bunnell came to my cell and denied me medical attention even though he observed stabbing incident." Amended Complaint ¶ 16. Although this allegation is not separately denominated as a claim for relief, under the required liberal construction of *pro se* pleadings, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding allegations of *pro se* complaint "to less stringent standard than formal pleadings drafted by lawyers), the court in addressing several nondispositive motions, construed this allegation as asserting an Eighth Amendment violation based on a failure to treat. May 6, 2014 Decision and Order (Dkt. 63), at 2, 3-4.

argues he should not have had to request medical attention for his injuries because Defendants observed the assault.  Plaintiff's Sur-Reply ¶ 6.

To substantiate an Eighth Amendment claim for medical indifference, an inmate plaintiff must prove the defendants were deliberately indifferent to a serious medical need.  *Farmer*, 511 U.S. at 834-35.  Where the inmate plaintiff alleges defendants failed to provide any treatment for a medical condition, "courts examine whether the inmate's medical condition is sufficiently serious."  *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).  "[P]rison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons."  *Sonds v. St. Barnabas Hospital Correctional Health Services*, 101 F.Supp.2d 303, 311 (S.D.N.Y. 2001) (citing cases).  "[A] prisoner does not have the right to choose his medical treatment as long as he received adequate treatment," *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011), and a difference of opinion between an inmate and prison officials as to prescribed medical treatment does not, as a matter of law, rise to the level of a constitutional violation.  *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1988).  Where, as here, the challenge is to the adequacy of the treatment provided, such as in cases where treatment is alleged to have been delayed, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, not considered in the abstract."  *Smith*, 316 F.3d at 186.  In the instant case, Plaintiff has failed to point to any evidence raising a genuine issue of fact on which a reasonable jury could find the delay in obtaining treatment for Plaintiff's stab wounds posed a substantial risk of serious harm.

Specifically, on the Discharge Summary from Arnot Ogden relevant to Plaintiff's three-day hospitalization following the assault ("Discharge Summary"),[10] Plaintiff's stab wounds are described as "superficial" and the reason for Plaintiff's hospitalization was not treatment of the stab wounds, Discharge Summary at 1 ("CT of the chest and neck showed superficial wounds."); rather, Plaintiff "was admitted for chest pain, rule out ACS,[11] on telemetry with serial troponins and a stress echocardiogram." *Id.*[12] Significantly, Plaintiff does not allege he experienced any symptoms of ACS immediately following the assault. Moreover, the documented superficiality of Plaintiff's stab wounds, as established by the Discharge Summary filed by Plaintiff, the accuracy of which Plaintiff does not dispute, is consistent with statements by Bunnell and Taylor that they were unaware Plaintiff had been injured in the assault until several hours later, *see* Bunnell Declaration ¶ 4 (stating Bunnell did not interact with Plaintiff on June 8, 2012, and was unaware Plaintiff was in need of any medical attention); Taylor Declaration ¶¶ 4-9 (explaining Taylor did not become aware Plaintiff was in need of any medical attention until Taylor was making his rounds at 8:15 P.M. on June 8, 2012, and, upon being advised by Plaintiff of the attack, immediately reported the attack to Youmans who advised Taylor immediately escort Plaintiff to Elmira's medical unit and Taylor complied), regardless of whether Defendants observed the assault. No reasonable jury could find on this record that Defendants were deliberately indifferent to

---

[10] Plaintiff's Exh. F.

[11] Acute cardiac syndrome or "ACS" "is an umbrella term for situations where the blood supplied to the heart muscle is suddenly blocked." *See* American Heart Association: Acute Coronary Syndrome, available at: http://www.heart.org/HEARTORG/Conditions/HeartAttack/AboutHeartAttacks/Acute-Coronary-Syndrome_UCM_428752_Article.jsp#.V6syVmf2aic, *last visited* Aug. 10, 2016.

[12] Although Plaintiff asserts he was hospitalized at Arnot Ogden for six days, Amended Complaint ¶ 20; Plaintiff's Statement of Facts ¶ 9, the Discharge Summary indicates Plaintiff was admitted for only three days, *i.e.*, June 9 through 12, 20-12. Discharge Summary at 1. On a later occasion, Plaintiff indicates he spent three days in Arnot Ogden. Plaintiff's Affidavit ¶ 16 (citing Discharge Statement).

any substantial risk of serious harm posed to Plaintiff by the stab wounds.  Accordingly, summary judgment should be GRANTED on this claim.

### b.    Deprivations

Plaintiff alleges that pursuant to a deprivation order, he was denied showers, legal mail, and food for the three weeks Plaintiff spent in SHU in connection with the Second Misbehavior Report issued by Defendant Staight.  Amended Complaint ¶ 22 and at 12.   Plaintiff further maintains that when he complained of the deprivations to Defendants Chappius, Wenderlich, Youmans, and Diego, no action was taken to alleviate the deprivations.  *Id.* ¶ 23, and at 12.  Plaintiff also maintains that Defendants destroyed or lost Plaintiff's personal property, including trial transcripts, his personal television, and a copy of the Quran.  *Id.* ¶¶ 24-28.

In support of summary judgment, Defendants argue there is no proof that Plaintiff was on any deprivation order while in SHU, Defendants' Memorandum at 17, and insofar as Plaintiff maintains his trial transcripts were lost or destroyed, Plaintiff has not and cannot demonstrate any actual injury as required, *id.* at 18, Plaintiff can establish no personal involvement by any Defendant in the alleged deprivations, *id.* at 18-19, and with regard to the other personal property, the law is well settled that denial of access to such items does not amount to a constitutional violation, even when considered in the collective.  *Id.* at 19.  In opposition to summary judgment, Plaintiff reiterates that while in SHU for three weeks following his discharge from Arnot Ogden, Plaintiff was not fed and was denied showers and legal mail, and that Defendants Chappius, Wenderlich, Diego and Youmans failed to take any action regarding the deprivations in response to Plaintiff's complaints.  Plaintiff's Affidavit ¶¶ 17-19.  Plaintiff further argues that upon

being transferred from Elmira to Southport, C.O. Miller, a non-party to this action, brought Plaintiff his property and advised that Plaintiff's trial transcripts, television and Quran were missing, establishing Defendant Morris, Bunnell, Taylor and Staight failed to properly secure Plaintiff's property in preparation for Plaintiff's transfer to Southport. Plantiff's Response ¶¶ 14-17; Plaintiff's Affidavit ¶¶ 20-22.  In further support of summary judgment, Defendants argue Plaintiff can meet neither the objective nor subjective component for his deprivation claims.  Defendants' Reply at 7-9.

      With regard to the deprivations of food, legal mail, and showers Plaintiff alleges he endured while housed in Elmira's SHU for three weeks following his discharge from Arnot Ogden as a result of the Second Misbehavior Report, Plaintiff does not deny Defendants' assertion, Defendants' Memorandum at 17; Defendants' Reply at 7-8, that Plaintiff was never subjected to any deprivation order while housed in SHU such that Plaintiff is unable to establish the objective prong of his Eighth Amendment deprivation claim.  Significantly, both Chappius and Wenderlich deny that Plaintiff was placed on any deprivation order while housed in SHU and, to the contrary, Plaintiff continued to enjoy all the rights and privileges enjoyed by other SHU inmates while so confined. Chappius Declaration ¶ 25; Wenderlich Declaration ¶ 29.  Neither has Plaintiff provided a copy of the asserted deprivation order, nor argued that his request for a copy of such order was refused.  Insofar as Plaintiff maintains a deprivation order was posted on his SHU cell door, Plaintiff's Dep. Tr. at 124, Plaintiff is unable to identify who posted the deprivation order, *id.* at 126, and has not provided any statement from any other inmate who observed the order.  Accordingly, Plaintiff is unable to show the requisite personal involvement for liability as to any of the Defendants on this claim.  *Spavone*, 719 F.3d at

135 (requiring personal involvement in the alleged constitutional deprivation for liability in a § 1983 action).  On this record, no reasonable jury could find that Plaintiff was subjected to any deprivation order while housed in SHU on the Second Misbehavior Report and summary judgment should be GRANTED on this aspect of Plaintiff's conditions of confinement claim.

Insofar as Plaintiff asserts an Eighth Amendment claim based on the deprivation of personal property, including trial transcripts, a television, and a copy of the Quran, because no constitutional right prohibits prison officials from confiscating an inmate's personal property provided such confiscation is in accordance with due process, *Hudson v. Palmer*, 462 U.S. 517, 540 (1983), such allegations are addressed in connection with Plaintiff's Fourteenth Amendment due process claim.  *See* Discussion, *infra*, at 26-27.

### C.    Fourteenth Amendment Due Process

Plaintiff alleges he was denied due process under the Fourteenth Amendment when Defendants lost or destroyed Plaintiff's legal work.  Amended Complaint at 13.   In support of summary judgment, Defendants argue there is no evidence any Defendants were personally involved in the destruction or loss of Plaintiff's personal property, or in arranging for Plaintiff's confinement in SHU.  Defendants' Memorandum at 20-21.  In opposition to summary judgment, Plaintiff argues Defendants Morris, Bunnell, Taylor and Staight violated Plaintiff's Fourteenth Amendment rights by failing to secure Plaintiff's property while he was in Arnot Ogden and SHU resulting in the loss or destruction of Plaintiff's legal work, television, and Quran.  Plaintiff's Response ¶¶ 13-16.  According to Plaintiff, without the trial transcripts that were among the personal

property Defendants lost or destroyed, Plaintiff is unable to litigate future motions in court and obtaining new copies of the trial transcripts will pose a financial hardship to Plaintiff. *Id.* ¶ 17. In further support of summary judgment, Defendants argue Plaintiff has failed to produce any evidence that Defendants lost or destroyed his personal property. Defendants' Reply at 2. In further opposition to summary judgment, Plaintiff argues that he had no choice but to permit Defendants to pack Plaintiff's personal property in connection with Plaintiff's transfer from Elmira to Southport. Plaintiff's Sur-Reply ¶ 9.

There is no merit to Plaintiff's § 1983 claim requiring trial based on the denial of other personal property, including trial transcripts, his television, and a copy of the Quran as even the intentional destruction of an inmate's personal property may not be the basis of a constitutional claim provided sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer*, 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)). Significantly, the Second Circuit has long recognized that New York provides, through inmate grievance and Art. 78 proceedings, such "an adequate post deprivation remedy in the form of, *inter alia*, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001). Accordingly, Defendants' loss or destruction of Plaintiff's personal property, even if true, cannot support Plaintiff's Fourteenth Amendment due process claim for which summary judgment should be GRANTED.

### D. First Amendment

Insofar as Plaintiff alleges Defendants destroyed or lost the transcripts for the criminal trial resulting in the sentence of incarceration for which Plaintiff was

incarcerated at all times relevant to this action, such assertion raises a First Amendment denial of access to the courts claim.  It is settled that "meaningful access to the courts is the touchstone" of the First Amendment.  *Bounds v. Smith*, 430 U.S. 817, 823 (1977).  The right of access to the courts as espoused by *Bounds*, *supra*, places an affirmative duty on prison officials to provide constitutionally adequate access such that where the inmate alleges inadequate law libraries, or other sources of legal knowledge, or a prison official's interference with the physical filing of legal papers, no actual injury need be alleged.  *Id.* at 829.  Where, however, as here, "the claims do not involve such an allegation, the court must consider whether the plaintiff has alleged an 'actual injury' to court access."  *Griffin v. Coughlin*, 743 F.Supp. 1006, 1021-22 (N.D.N.Y. 1990).  Here, an "actual injury" requires a showing that it was the actions of Defendants that materially prejudiced Plaintiff's direct appeal or habeas proceeding.  *Howard v. Leonardo*, 845 F. Supp. 943, 947 (N.D.N.Y. 1994) (holding an "actual injury" requires a showing that the defendants' actions interfered with the court's resolution of the inmate plaintiff's legal proceeding).  Plaintiff, however, fails to do so, nor is it possible given that Plaintiff's relevant criminal conviction occurred in 2001, such that by 2012, the time in which Plaintiff had to directly appeal the conviction or to petition for habeas relief would have run, and Plaintiff does not argue otherwise.  Accordingly, insofar as the Amended Complaint can be construed as raising a First Amendment access to the courts claim, summary judgment should be GRANTED.

Relevant to Plaintiff's allegations that Defendants placed Plaintiff in disciplinary housing and lost or destroyed Plaintiff's personal property for filing grievances against various DOCCS officials, Amended Complaint at 13, Plaintiff asserts a First Amendment

retaliation claim. Defendants argue in support of summary judgment on this claim that while the destruction of an inmate's personal property can constitute an adverse action for purposes of a retaliation claim, Plaintiff must prove a causal connection between the protected speech and the alleged adverse action which Plaintiff is unable to do based on the record in this case. Defendants' Memorandum at 20. Plaintiff has not argued in opposition to summary judgment on this claim, which Defendants assert establishes Plaintiff has conceded to their argument. Defendants' Reply at 9-10.

Plaintiff, by failing to argue in opposition to summary judgment on this claim, has conceded it. *See Molinari v. Bloomberg*, 564 F.3d 587, 609 n. 15 (2d Cir. 2009) (deeming abandoned claim to which appellant offered no response to appellees' argument on appeal). Accordingly, summary judgment should be GRANTED insofar as Plaintiff has raised a First Amendment retaliation claim.

## 2.    Motion for Injunctive Relief

Plaintiff filed his motion seeking injunctive relief while incarcerated at Clinton Correctional Facility ("Clinton"), in Dannemora, New York, seeking to be transferred from Clinton because of alleged unspecified wrongful conduct committed by unidentified individuals pertaining to Plaintiff's incarceration after he filed the instant action. Plaintiff's Motion at 1. According to Plaintiff, "they" are engaging in the unspecified unlawful conduct to coerce Plaintiff to discontinue this action. In opposition, Defendants argue Plaintiff has failed to show any privity between Defendants to this action and the unknown actors about whom Plaintiff complains in his motion for injunctive relief, and nowhere within Plaintiff's single page motion is there any evidence of actual, imminent danger required for the requested injunctive relief. Defendants' Response at 1. In

further support of his motion, Plaintiff specifies that he is seeking a preliminary injunction enjoining Clinton Superintendent Michael Kirkpatrick ("Kirkpatrick"), Clinton Deputy Superintendent of Security E. Bell ("Bell"), Deputy Superintendent of Administration D. Keyser ("Keyser"), and Security Captain P. Devlin ("Devlin"), from engaging in any type of retaliation, verbal and physical harassment and assaults while Plaintiff is incarcerated at Clinton. Plaintiff's Reply ¶ 6. Plaintiff requests the same injunctive relief relative to Plaintiff's filing of inmate grievances and the instant action. *Id.* ¶¶ 7-9.

Preliminarily, assuming, arguendo, the District Judge agrees with the recommendation that summary judgment be granted in favor of Defendants, Plaintiff's motion for injunctive relief is DISMISSED as moot. Alternatively, although Plaintiff's motion establishes Plaintiff is seeking injunctive relief relative to wrongful conduct Plaintiff maintains he has endured at Clinton, the Amended Complaint is asserted against only DOCCS employees at Elmira. Significantly, it is fundamental that the person against whom injunctive relief is sought be a party or a person in privity with the parties to the underlying action. *See* Fed.R.Civ.P. 65(d)(2) (injunctive relief available against parties, officers, agents, servants, employees, and attorneys and persons in active concert or participation with same); *Doctor's Associates, Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302-03 (2d Cir. 1999) (Rule 65(d)(2) prohibits court from enjoining nonparties to federal action from prosecuting their own state court actions against same defendant to federal action where nonparties were not alleged to have aided and abetted defendants). Accordingly, inasmuch as Plaintiff seeks injunctive relief against a non-party, such relief is not available. Fed.R.Civ.P. 65(d)(2); *Doctor's Associates, Inc.*,

191 F.3d at 302-03.   Plaintiff thus cannot obtain injunctive relief relative to the conduct of DOCCS employees at Clinton and, as such, Plaintiff's Motion, in the alternative to being dismissed as moot, should be DENIED.

## CONCLUSION

Defendants' Motion (Dkt. 96) should be GRANTED with Plaintiff's motion for injunctive relief (Dkt. 117) DISMISSED as moot, and the Clerk of the Court should be directed to close the file.  Alternatively, Plaintiff's motion for injunctive relief (Dkt. 117) should be DENIED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       August  11, 2016
             Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      August 11, 2016
            Buffalo, New York